IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


TINA M. JESSUP,

      Plaintiff,

vs.                                          Case No. 1:09cv149-MP/WCS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/


# REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Tina M. Jessup, applied for supplemental security income benefits. Plaintiff alleges disability due to rheumatoid arthritis and depression, with onset on January 1, 1999. Plaintiff was 41 years old at the time of the administrative hearing (on July 16, 2008), has a 12th grade equivalency education, and has marginal past relevant

work as a telemarketer. The Administrative Law Judge found that Plaintiff has the residual functional capacity to perform light work, with limitations, can do several jobs identified by the vocational expert as within that residual functional capacity and, thus, is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?
2. Does the individual have any severe impairments?
3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?
4. Does the individual have any impairments which prevent past relevant work?
5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified at the hearing that she has rheumatoid arthritis which has become steadily worse.  Doc. 10, R. 385.[2]  She said she had compression fractures in her spine.  Id.  She said she had severe migraine headaches.  R. 386.  Plaintiff said that she had difficulty walking or sitting for a long time, and had problems using her hands.  R. 387.  She said that when "both feet are, are bad, I can't walk at all."  Id.  She said she uses a cane.  Id.  Plaintiff thought that she could walk "maybe a hundred feet," but does

---

[1] Descriptions of the purpose and effects of prescription drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.  Information about medical terms and prescription drugs also come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[2] The record has been electronically filed in three segments, as documents 10, 10-1, and 10-2, and page numbers have been electronically assigned to each portion of the record.  However, I will cite to the page number of the record that is printed in the upper right hand corner.

not walk without her cane. R. 388-389. She thought that she could sit for only 20 minutes. R. 389.

Plaintiff testified that her hands would swell "like sausages," and she could not open a jar or manipulate buttons. R. 389-390. She said that she could cradle a gallon of milk and carry it across a room. R. 390.

When asked whether she had problems paying attention, she said "I don't think so, but maybe I do." R. 390. She said that she could focus on television for an hour or so before dozing off. R. 391.

Plaintiff said she was taking morphine, MS Contin,[3] Lortab,[4] and Methotrexate.[5] R. 387. She said that she suffered diarrhea and vomiting after taking Methotrexate.[6] R. 387-388. She was taking "Furinol" [sic, Fiorinal[7]] for migraine headaches. R. 386. She

---

[3] MS Contin, a controlled-release tablet containing morphine, is used to relieve moderate to severe pain. While regular morphine is usually given every 4 hours, MS Contin is typically taken every 12 hours – only twice a day. The Kadian brand may be taken once or twice a day. The drugs are intended for people who need a morphine painkiller for more than just a few days. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[4] Lortab is one of the brand names for hydrocodone. PHYSICIANS' DESK REFERENCE (2004), p. 3233.

[5] Methotrexate is a medicine that inhibits the metabolism of certain types of cells. It is used to treat certain cancers, rheumatoid arthritis (including polyarticular juvenile arthritis), and severe psoriasis. Methotrexate can cause serious and life-threatening side effects. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] There is also evidence that she took Methotrexate for only three weeks, and, due to side effects, had stopped on January 11, 2008, before this hearing. R. 279.

[7] Fiorinal is used for the relief of tension headache symptoms caused by muscle contractions in the head, neck, and shoulder area. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Case No. 1:09cv149-MP/WCS

said that the pain medications made her drowsy and she takes three or four naps a day. R. 388.

Plaintiff said that she does not have problems associating with other people, but usually stays at home. R. 391. She said she had "70-year old ladies waiting on me," and she felt bad about that. R. 392. She smokes cigarettes, one-half pack (presumably daily). *Id.*

Plaintiff said that during the day, she takes her medication, goes to bed to watch television, fixes simple food, and reads. R. 393. She said she was in bed most of the day. *Id.* About once a week she goes to the grocery store with her husband. *Id.* She can only shower three times a week and uses a seat in the shower. R. 394. She said she needs help to dress. *Id.* Her husband does most of the house cleaning and laundry. R. 395.

The ALJ asked the vocational expert to assume a hypothetical individual between the ages of 31 and 41, with a GED but with no past relevant work, who can perform light work, with limited ability to push and pull, can occasionally climb, balance, stoop, kneel, crouch, and crawl, must avoid exposure to hazards, can follow simple instructions, and has occasional episodes of decreased attention and concentration, but can maintain a work routine and adjust to changes. R. 399-400. The vocational expert said that such a person could do work as a counter clerk or furniture retail consultant. R. 400-401. The vocational expert said, however, that there would be no jobs in the national economy which the hypothetical person could do if the hypothetical person had to take three or four naps for 30 to 40 minutes a day. R. 401.

**Medical evidence**

On May 10, 2004, Plaintiff was admitted for treatment to St. Joseph Hospital in Indiana and was discharged on May 13, 2004. R. 124. She came in "on a 72-hour detention order." *Id*.

> She was found in a ditch. She was passed out, and she had a gun at her side. Urine drug screen proved to be positive for amphetamines, barbiturates, benzodiazepines and opiates. She does use Tylenol #4 and Fiorinal with codeine. She uses up to six Sudafed a day, and also uses some of the over-the-counter ephedra.
>
>     *     *     *
>
> She stated from her memory that she had had a car accident and was taken home, and then realized she needed to get her [car], and was walking there when she passed out in the ditch.

*Id*. On admission to the hospital, Plaintiff also admitted to using Valium. R. 126. She said that she was "a little achy today," and had "some rheumatoid arthritis." *Id*. She was "a little defensive about her husband[']s pain medications." *Id*. On discharge, the diagnosis was polysubstance dependence, personality disorder not otherwise specified, rheumatoid arthritis. R. 124. She was assigned a GAF score of 45.[8] *Id*. She

---

[8] GAF is Global Assessment of Functioning. "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002). A GAF score of 41-50 indicates: "Severe symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e,g., no friends, unable to keep a job)." Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

apparently had been assigned a GAF score of 20 on admission or shortly thereafter.[9] R. 123.

On February 24, 2006, Plaintiff was seen by Karen R. Ringwald, M.D. R. 136-138. She was then in the Allen County Jail in Indiana. R. 136. Plaintiff complained of swelling of her left foot and pain which had progressed to every joint in her body. *Id.* She described pain and swelling in her hands, fingers, wrists, elbows, and feet, and muscle pain in her back, arms, and legs. *Id.* She described problems with sleep, depression, panic attacks, and anxiety attacks, with trials of Paxil and Wellbutrin. *Id.* Plaintiff asked for a different pain medication. *Id.* Dr. Ringwald found no evidence of ANA-related disorder. *Id.* On physical examination, Dr. Ringwald found no evidence of cyanosis, clubbing, or edema in the extremities. R. 137. Some trace swelling was noted bilaterally in Plaintiff's wrists, greater on the left. *Id.* Dr. Ringwald noted:

> Her MCP joints of the hands, second and third bilaterally reveal some very mild chronic synovial proliferation but there was no evidence of tenderness or warmth there either. Elbows, shoulders, hips, knees, ankles and small joints [were] without any evidence of frank synovitis.

R. 137. Dr. Ringwald said:

> She does have some very mild swelling located on the left wrist and possibly even the right wrist today, but I see nothing that looks active as far as having a true active flare of her RA [rheumatoid arthritis] at this time.

R. 138. Dr. Ringwald concluded that Plaintiff's rheumatoid arthritis was more chronic in nature "as compared to having a true acute flare." *Id.* Depression was noted, along

---

[9] There is a handwritten notation on May 11, 2004, of a GAF score of 20/45. R. 123. The lower score must be earlier in the admission as Plaintiff improved and was discharged.

with a previous history of migraine headaches, past smoking history, and a previous history of heart murmur. *Id.*

On March 6, 2006, Plaintiff had a series of x-rays of her feet, hands, and wrists. R. 139-149. Erosive degenerative changes that might be osteoarthritis or rheumatoid arthritis were noted. R. 139-149.

On August 2, 2006, Plaintiff was evaluated on a consultative basis for her mental status by Andres Nazario, Ph.D. R. 213. She drove 50 miles to the examination. *Id.* It was observed that she walked without difficulty, and her posture and gait appeared to be within normal limits. *Id.* She wore a brace over her left wrist, and her right foot turned inside "a little bit." *Id.* She was cooperative throughout the interview. *Id.* Plaintiff described her hospitalization in the spring of 2004 as a "nervous breakdown." R. 214. She reported a history of drug and alcohol abuse. *Id.* Plaintiff reported that she could go shopping for groceries "with help." *Id.* She said that she was in federal prison for six months for buying a firearm and putting the wrong address on the application, and her husband went to prison for ten months for the same offense. *Id.* Plaintiff regarded this as a "minor paperwork thing." *Id.* Dr. Nazario found upon examination that Plaintiff's mood and affect were stable and appropriate, and there was no evidence of delusions or obsessions. R. 215. Plaintiff's memory, both recent and remote, appeared to be intact. *Id.* She performed memory and recall tests accurately. *Id.* She was able to concentrate during the interview, persist in her approach, and her pace appeared to be adequate. *Id.* The diagnosis was adjustment disorder with mixed anxiety and depressed mood, chronic. *Id.* Dr. Nazario noted Plaintiff's rheumatoid arthritis and concluded:

> She reports mild symptoms of depression and anxiety about her medical condition and legal problems. She appears bright and competent and able to concentrate. She is able to understand and follow directions. She appears able to interact with others appropriately.

*Id.*

A state agency physician filled out a mental status form on August 15, 2006. R. 221. He found that Plaintiff had affective disorders, anxiety related disorders, and adjustment disorder that caused only mild restrictions. R. 221-224.

Plaintiff was examined by Robert A. Greenberg, M.D., on a consultative basis on September 13, 2006. R. 228. Dr. Greenberg noted that Plaintiff had decreased range of motion of her cervical spine, but had full range of motion of all other joints. *Id.* She had decreased strength in her right leg, but no other motor, sensory, or reflex abnormalities were noted. *Id.* He found that Plaintiff's fine manipulation of her hands was normal, though there was mild ulnar deviation in both hands, and there was mild swelling in Plaintiff's fingers. *Id.* Plaintiff had pain in range of motion of all her joints, and pain on palpation of her right ankle. *Id.* No other evidence of active, inflammatory arthritis was noted. *Id.* Dr. Greenberg said that Plaintiff walked "with a slow, broad-based type of gait due to her pain but did not require any assisting device for ambulation." *Id.* She had no straight leg raising pain, but was unable to tandem walk and could not walk on her heels and toes, and had difficulty stooping. *Id.* Dr. Greenberg's impression was "generalized rheumatoid arthritis." R. 229.

A state agency physician determined that Plaintiff could lift 20 pounds occasionally, and frequently lift and carry 10 pounds. R. 233. He felt she could stand, walk, or sit 6 hours in an 8 hour day. *Id.*

On October 18, 2006, Gary T. Gossinger, M.D., a psychiatrist, examined Plaintiff. R. 250. He noted a "well documented history of rheumatoid arthritis." *Id.* He said that despite treatment, "she is quite symptomatic which limits her mobility" and had "chronic pain." *Id.* He also noted "chronic depression." *Id.* On examination, he thought that Plaintiff exhibited "a number of signs compatible with depression." *Id.* Her memory was intact and there were no abnormalities in her thinking. *Id.* She seemed motivated to get better. *Id.* A trial of Cymbalta[10] was prescribed, though Topamax[11] was also considered. *Id.*

On November 29, 2006, another mental health assessment was completed by a state agency physician, Dr. Angeles Alvarez-Mullin. R. 251. A few moderate limitations were noted, but mostly she was thought to have no mental limitations. R. 251-251. It was also thought that although Plaintiff may experience occasional episodes of decreased attention due to pain, she would be able to maintain a work routine, follow simple instructions, get along with others, and adjust to changes. R. 253.

On January 4, 2007, Dr. Jeffrey T. HansPetersen wrote a note stating that he had treated Plaintiff since June, 2006. R. 270. He said that her rheumatoid arthritis had been very active, despite treatment with medications. *Id.* He said that this caused "persistent joint discomfort and limitations of her activity tolerance." *Id.* He said that Plaintiff had suffered several significant and debilitating side effects (fever, nausea,

---

[10] Cymbalta is used to treat major depression. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[11] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures. It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks. PDRhealth™, PHYSICIANS DESKTOP REFERENCE

Case No. 1:09cv149-MP/WCS

headaches, and muscle pain) from her medications. *Id.* He said that Plaintiff needed treatment from a qualified rheumatologist, but could not afford such treatment. *Id.*

On November 13, 2007, Plaintiff was examined for chronic sinusitis by John M. Caroline, M.D., at the Shands University of Florida Clinic. R. 306. On examination, no edema was noted in her upper or lower extremities. R. 307.

On January 11, 2008, Plaintiff was seen at the Shands University of Florida Clinic by Prasanthi Kakumanu, M.D., a rheumatologist. R. 279. Plaintiff complained of "morning stiffness all day, MCP, PIP, and bilateral wrist pain and swelling." *Id.* She said she had difficulty walking due to lower back and right hip pain. *Id.* Dr. Kakumanu found that Plaintiff had "1+ MCP swelling bilaterally of her second, third, and fourth MCPs," and some tenderness on palpation of the bilateral ulnar styloids. Dr. Kakumanu determined that Plaintiff "does not appear to have any crippling deformities of her hands or feet." R. 280. He said she had some difficulty walking due to back pain. *Id.* After reviewing x-rays and blood work, Dr. Kakumanu said: "Overall these results suggest that if the patient has rheumatoid arthritis, then it is not progressive over 12 years and has entirely benign prognostic features." R. 281.

On January 16, 2008, John Caroline, D.O., wrote a letter for Plaintiff. R. 278. He said that he is a family medicine physician and had been treating Plaintiff since October 7, 2007. *Id.* He said that he had no experience in long-term disability, and deferred to Plaintiff's rheumatology specialist at the University of Florida. *Id.*

On March 21, 2008, Plaintiff was seen at the University of Florida rheumatology clinic by Michael R. Bubb, M.D. R. 275. Dr. Bubb noted:

> When we last saw her in January, which actually was her first visit, she had no evidence of active synovitis and we questioned whether she had any active rheumatoid arthritis. In fact her laboratory studies at that time showed no elevation of serologic markers, with sedimentation rate of 11 and a borderline CRP of 5.1 mg per liter and her x-rays showed well corticated lesions suggesting that if she did have rheumatoid arthritis that it had been inactive for some time. We suggested that she basically stop her rheumatoid arthritis medications and this highly motivated woman was actually able to stop prednisone from a dose of 30 mg, after gradually decreasing to completely discontinue this medication. Stopping the medication caused no increase in her joint swelling or her joint stiffness.

R. 275. He noted that she took Valium for chronic back pain, and "clearly" had "a history of compression fractures based on prior x-ray reports." *Id*.

On examination, Dr. Bubb found that Plaintiff's sensation and muscle strength were normal. R. 276. She had "some mild swelling" bilaterally of the wrists, with diffuse tenderness throughout the hand, and slightly diminished flexion and extension of the wrist. *Id*. She had no focal spinal tenderness, and her MCPs, PIP, DIP joints were normal. *Id*. Plaintiff's other joints showed no evidence of active synovitis. *Id*. Dr. Bubb concluded that Plaintiff had a history of rheumatoid arthritis which was then inactive. *Id*. He said she did have degenerative changes in her joints as a result of prior active rheumatoid arthritis, and might also have "a component of fibromyalgia, although this certainly is not prominent." *Id*. Dr. Bubb thought that Plaintiff's back pain was specifically related to "prior compression fractures and osteoporosis." *Id*.

Dr. Bubb thought it wise not to start medication for active rheumatoid arthritis, but to use long-acting narcotic analgesics as needed. *Id*. He recommended a DEXA scan for osteoporosis. *Id*. He said: "She is probably an excellent candidate for physical therapy and occupational therapy given her excellent motivation." *Id*. He planned an

MRI of Plaintiff's left hand and wrist, thinking that she might have "some mild disease activity in these joints that could benefit from therapy." *Id.*

On April 2, 2008, Plaintiff was examined by Nina Barnes, Ph.D., for an "adult mental health evaluation" for the State Office of Disability. R. 311. The appointment was in Perry, Florida, and she took turns with her husband driving from Cross City to the appointment. *Id.* She walked with a cane, and her right foot was slanted inward. *Id.* She wore a brace on her right wrist and a glove without fingers on her left hand. *Id.* These, said Dr. Barnes, were signs of "invalidism." *Id.* "Gait was remarkable for being slow and with the use of a cane." *Id.* Plaintiff reported that she had never attempted to work outside the home. R. 312. Plaintiff told Dr. Barnes that she "kinda" brushes her hair and "tries" to brush her teeth, but Dr. Barnes said that Plaintiff's hair and teeth "look okay to me." R. 313. On examination, Dr. Barnes found Plaintiff to have normal memory, intact attention and concentration, and fair insight and judgment. R. 314. The diagnosis was mood disorder due to rheumatoid arthritis. *Id.*

On April 17, 2008, another mental residual functional capacity assessment was made by State agency consultant J. Patricia Peterson, Ph.D. R. 316. Dr. Petersen thought that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods. R. 316-317. Dr. Peterson concluded that Plaintiff had only mild to moderate adjustment reaction with depressive features, but still resided independently with her husband, effectively handles a normal array of personal and household responsibilities, continues to function

adequately in a full range of routine activities of daily living, and "may likewise be considered still able to sustain the mental demands of appropriate concentrated task-oriented activity at this time as well." R. 318.

May 9, 2008, Plaintiff was seen in the Shands Psychiatric Pain Clinic by Joseph P. Pagano, M.D.. R. 368-371. It was noted that her pain had been "well controlled." R. 368. Plaintiff sat comfortably in a chair, and her gait, station, and range of motion were normal. *Id.* Her motor strength was equal and symmetrical. R. 369. Her attention, memory, and concentration were intact, and her mood was "OK." *Id.* The assessment was that she was stable and satisfactory. *Id.* Plaintiff's pain medications were adjusted. *Id.*

` On September 8, 2008, Plaintiff reported to the Pain Clinic that her joints ached "very severely," her fingers sometimes locked up and were bloated, her neck was stiff, her feet would swell, she could not bend over, and she was in lots of pain. R. 372. She said her pain varied from 4 to 8 on a scale of 10, that she spent her days lying or sitting, and she said that she was unable to work. R. 374. A prescription for OxyContin[12] was continued. R. 375.

**Legal analysis**

**Whether the ALJ violated the Eleventh Circuit pain standard**

Plaintiff contends that the ALJ rejected Plaintiff's testimony "with no evidentiary basis for doing so." Doc. 12, p. 9. Plaintiff argues that the evidence of the condition of

---

[12] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance. It is used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. PHYSICIANS' DESK REFERENCE (2005).

her wrists and foot "could reasonably give rise to Plaintiff's pain complaints." *Id.*, p. 12. Plaintiff argues that her complaints of pain must be true or otherwise physicians were prescribing "unneeded narcotics." *Id.*

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Id. at 1562, quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

The Administrative Law Judge correctly cited Eleventh Circuit law. R. 19. She noted that x-rays were "all normal," examinations revealed no synovitis of the joints, no knee swelling, and only mild swelling of the wrists, mild crepitus of the knees, and general arthralgias. R. 20. She noted that examinations revealed no red or swollen joints, no obvious joint deformity, no prescription for use of a cane, normal reflexes, no edema of joints of the extremities, and no acute distress. Id. She observed that physicians reported that Plaintiff did not have active rheumatoid arthritis, her rheumatoid arthritis had not progressed over the prior 12 years, and her rheumatoid arthritis had "entirely benign prognostic features." Id. She noted that stopping Prednisone in 2008 did not cause an increase in joint swelling and her rheumatoid arthritis remained inactive. Id. Based upon these findings, the ALJ gave little weight to the opinion of Dr. HansPetersen, who said that Plaintiff's rheumatoid arthritis was "very active." Id. She noted that during examination, Plaintiff had mentioned that "getting a diagnosis of RA [rheumatoid arthritis] would be a medical condition that would help her case for disability." Id. Based upon all of these observations, the ALJ determined that Plaintiff's statements concerning the intensity of the effects of her symptoms was "not entirely credible and would not preclude medium work as described above." R. 21.

All of these findings are supported by substantial evidence in the record discussed above. The findings correctly followed Eleventh Circuit law and are adequate to support the credibility finding made by the ALJ.

**Whether the ALJ correctly presented all of Plaintiff's mental residual functional capacity limitations in the hypothetical presented to the vocational expert**

Plaintiff here relies upon the mental residual functional capacity assessments made by non-examining State agency consultants. Plaintiff argues that the ALJ failed to rely upon these assessments in posing a hypothetical to the vocational expert. In posing the hypothetical to the vocational expert, the ALJ said that she relied upon Dr. Alvarez-Mullin's assessment (Ex. 14F, R. 253) to "change the mentals" to a person who "can follow simple instructions, would have occasional episodes of decreased attention and concentration, but can maintain a work routine and adjust, and adjust to changes." R. 400. This accurately tracked the assessment by Dr. Alvarez-Mullin, that despite a few moderate limitations, and though Plaintiff may experience occasional episodes of decreased attention due to pain, she would be able to maintain a work routine, follow simple instructions, get along with others, and adjust to changes. R. 253. It is also the same sort of assessment as made by Dr. Nazario in 2006, R. 213, Dr. Barnes in 2008, R. 311-314, and Dr. Peterson in 2008. R. 318. The vocational expert said that with those limitations, this hypothetical individual could do work as a counter clerk and as a furniture retail consultant. R. 400-401. This argument is not persuasive.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 2, 2010.

        s/ William C. Sherrill, Jr.
        **WILLIAM C. SHERRILL, JR.**
        **UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**